UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 08-0291 (02) (MJD/FLN)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>V. )<br>)<br>BRADLEY CROWDER, )<br>)<br>Defendant. ) | **Position Regarding<br>Sentencing Factors** |

Mr. Crowder, through counsel, respectfully offers the following position regarding the factors applicable to his upcoming sentencing. For the reasons set forth below, we object to a sentence within the range suggested by the Guidelines, as set forth in the Pre-Sentence Investigation Report ("PSI"). Unique aspects of Mr. Crowder's past and present establish that a sentence of one year and one day is sufficient to address the sentencing objectives set forth at 18 U.S.C. § 3553.

**I. Bradley Crowder**

The PSI and the reference materials submitted to the Court under separate cover both present and address a paradox: How is it that a person with as long-standing and well-developed a set of convictions about social responsibility, ethical behavior and morality manufactured and possessed Molotov cocktails? Brad Crowder is revealed to be an unusual and impressive man, who developed a social conscience at a young age and who lived in accordance with his beliefs with a degree of integrity that few of us reach.

How is it that such a person committed this crime?

As far as who Bradley Crowder is, the PSI and reference materials show him to be unusually bright, with a thirst for knowledge and understanding. He was reading before he entered kindergarten, and was so attached to reading that, instead of more conventional time outs, his mother's primary form of punishment was to cut off his access to books.

Bradley Crowder's character is revealed by the fact that, from a young age, he walked the talk. As a fourth grade child, he learned about manufacturing processes overseas, and from then on refused to wear clothing produced with child labor. People offering references tell of a time when he faced eviction because a roommate had left without paying his share of the rent. Broke and about to lose his place to live, Mr. Crowder found a wallet containing $600 while walking across the parking lot from the bus stop to the sandwich shop where he worked. As soon as he entered the shop he made arrangements to have the wallet returned to its owner, money and all.[1] Presented with an easy way out of a difficult situation, he took the more difficult, ethical path.

These actions are the fruits of a positive set of beliefs, long and deeply held. From a young age, Mr. Crowder was powerfully affected by inequities in the allocation of wealth between rich and poor. His involvement in activities to counter racism began before he graduated from high school and continued ever since. He started a discussion

---

[1] Information about Mr. Crowder's background in activism was proffered to the Probation Office and verified, and is discussed in materials offered on his behalf under separate cover.

group in high school that focused on poverty, equality and other social issues. He worked in soup kitchens. He wrote and distributed anti-racist literature. He organized a counter-protest against a KKK rally in Midland and participated in others. Following Texas' adoption of an abstinence-based sex education curriculum, he distributed reproductive rights materials and worked to protect patients at the Planned Parenthood clinic in Midland. He regularly volunteered at a non-profit thrift store in Austin that directed its proceeds back into the community by funding other non-profits. These activities were verified by the Probation Office and confirmed by his mother and many others.[2]

In fairness, it should be noted that several arrests were made at the KKK counter-protest, although none resulted from anything Mr. Crowder did or promoted. Further, his activities there, in countering the Planned Parenthood blockade, and in the RNC itself were designed to do more than articulate a position or viewpoint. At various points in these events, Mr. Crowder and his peers tried to express their views in such a manner as to drown the others out, seeking to overwhelm the negative messages with positive ones. Their originally-planned activities at the RNC likewise included an effort to block traffic, moving from pure First Amendment expression into civil disobedience.

Mr. Crowder comes from humble roots. The depth and breadth of his beliefs are more remarkable because they developed in a setting far from affluence, in a town in

---

[2] See, e.g., PSI ¶ 43.

West Texas where such values were, to put it mildly, unpopular.[3]  He developed and advanced them in a hostile environment, at an age when his peers were playing sports and getting drivers licenses.

The reference materials present common themes that support this view.  Friends and family members talk of Mr. Crowder's longstanding concern about inequities of wealth and poverty, in his community and in the world.  They talk of his passionate opposition to sexism, racism, and homophobia, and of his activism in these areas, even in high school.  They note how carefully he listened to the views of others, even when those views were strongly opposed to his own.  They recognize and celebrate his idealism, and speak of how he has touched many lives in a positive manner already, and of how he is and will be an asset to the world in his future.  Although they in no way condone his crime, to a person, they talk of how proud they are of him, a sentiment not often seen at the point of sentencing, let alone in a case such as this.

On the other side of the paradox, the fact remains that Bradley Crowder manufactured and possessed Molotov cocktails, that although he and his co-defendant affirmatively decided against using them before his arrest,[4] there was nonetheless a point in time at which he contemplated using them, and that he stands accused of participating in throwing a highway sign off of an overpass.  Even though the tape of these events

---

[3] See, e.g., Trial testimony of David McKay ("McKay Tr.") at 12.

[4] PSI ¶¶ 9, 19.

shows that the people involved cautioned each other to avoid hitting anyone or anything, even though this was an attempt to block traffic and not to hurt people, the actions themselves are ones that created a real risk of serious injury.  Family members and others describe their confusion, and how inconsistent these activities are with who Bradley Crowder is.

The answer lies in several areas.  Mr. Crowder acknowledged that he is fully and solely responsible for his crime, has never wavered on this point, and does not do so now.  However, it is irrational not to consider the context in which he acted.  He came to Minnesota planning on engaging in long-recognized acts of non-violent civil disobedience, principally by using shields to block traffic.[5]  In the aftermath of the seizure of the shields, swept up into the superheated atmosphere of the convention and the protests that swirled around it, he foolishly, criminally, engaged in ideas and planning to hit back.  In the light of day, he saw the foolishness of any use of the devices he made, and stepped back.

In understanding how this person could have committed this crime, the offense can fairly be seen as something influenced by a combination of idealism, passion, youth, and an unusually pressured atmosphere.  Further, as discussed in greater detail below, the informant played a meaningful role in the events that preceded Mr. Crowder's offense.  This view is offered as an insight into how a principled, idealistic, committed young man

---

[5] Transcript of January 27, 2009 testimony ("Darby Tr. I") at 21-22.

could come to engage in the manufacture and possession of destructive devices. It is not offered as an excuse; Mr. Crowder makes none.

## II. Sentencing Issues

The informant's involvement in the events leading to the offense conduct belong among the sentencing considerations. Government involvement is a factor touched on by U.S.S.G. § 5K2.10, which considers conduct of others that contributed to the offense, something separate and distinct from coercion, which is addressed at § 5K2.12. Government involvement is also touched on by the Guidelines' recognition under § 3B1.2(b) that individuals' roles in offenses differ. Further, Mr. Crowder's pre-arrest decision against using the devices, confirmed by the fact that the time and location where he had discussed using them had passed by the time of his arrest, render this case one of possession, pure and simple.

### A. Government Conduct

Brandon Darby's testimony reflects that his connection to the offense conduct in this case began many months before the convention. Starting in February 2008, he began meeting with a group that included Mr. Crowder and David McKay.[6] Regular meetings continued as often as weekly through the spring and into the summer.[7] The group decided to form what has been described as an affinity group.

---

[6] Darby Tr. at 11.

[7] Darby Tr. I at 15, 84; Transcript of January 28, 2009 testimony ("Darby Tr. II") at 21-22.

At David McKay's plea, the Court asked about affinity groups in contrast to cells.[8] The difference is significant. Affinity groups are described as consisting of a small number of activists, usually trusted friends of a common ideology. They are non-hierarchical and, unlike cells, not subject to control from a separate, higher authority.[9] Mr. McKay's description of the group matches this definition.[10]

Through this process, Darby acknowledged that he played different roles, simultaneously.[11] He was an informant who asked for and got permission to break laws, including the power to trespass, resist arrest, and engage in disorderly conduct.[12] He also functioned as an elder,[13] or mentor.[14] He recognized that Mr. Crowder looked to him as a leader in their activities,[15] and solidified this role by directing Crowder to be in daily contact with him.[16]

Although instructed not to play a leadership role,[17] and although he opined that he

---

[8] Transcript of March 17, 2009 plea at 18-19.

[9] Wikipedia.

[10] Transcript of March 17, 2009 plea at 20-21.

[11] See, e.g., Darby Tr. I at 17, Darby Tr. II at 19-20.

[12] Darby Tr. I at 25-26 (the power to trespass, resist arrest, engage in disorderly conduct).

[13] Darby Tr. II at 8.

[14] Darby Tr. II at 9-10, 12-13.

[15] Darby Tr. II at 23; see also McKay Tr. at 13.

[16] Darby Tr. II at 24.

[17] Darby Tr. I at 26.

did not encourage anyone,[18] Darby's own testimony reflects conduct that can only be seen as encouraging and provocative. He talked up his credentials as a protester and activist.[19] He indicated at the first meeting that he had no interest in sitting around and talking, that he was interested in action.[20] He accused the other participants of being weak, and indicated that they would need to be tougher.[21] He continued this line of encouragement by offering and then giving Mr. Crowder and others martial arts training.[22] As a part of what he claimed was an investigative role, he acknowledged saying that he intended to shut the convention down, and that he anticipated success.[23]

In addition to encouragement, he provided material support. Darby traveled with Mr. Crowder to the Twin Cities to attend a planning meeting in May, 2008.[24] Darby paid for most of the travel expenses, the car, gas, hotels and food.

These facts show that the government was intimately involved in the events that led up to this case. We do not suggest entrapment, undue influence, coercion or duress; to the contrary, Mr. Crowder acknowledges that he is solely and fully responsible for his actions. However, the guidelines and common sense distinguish between coercion and

---

[18] Darby Tr. I at 42; Darby Tr. II at 64 (antiwar, KKK, Katrina, Halliburton protests) .

[19] Darby Tr. I at 76-77, 78-79.

[20] Darby Tr. I at 75.

[21] Darby Tr. I at 77-78.

[22] Darby Tr. I at 80-83; Darby Tr. II at 22.

[23] Darby Tr. I at 18, 75-76 ("I stated to them that I was going to shut that fucker down.")

[24] Darby Tr. I at 19; Darby Tr. II at 25.

duress, recognized at U.S.S.G. § 5K2.12, and victim conduct contributing to the offense, § 5K2.10. Mr. Crowder makes no claim of duress, and we do not rely on § 5K2.12. However, the government's role remains relevant, as acknowledged both by § 5K2.10, and § 3B1.2(b), and also by 18 U.S.C. § 3553(a), which calls for consideration of the nature and circumstances of the offense.

Although the record in this case in some ways shows Mr. Crowder to be less involved than his co-defendant in the manufacture and possession of Molotov cocktails, it does not establish him to be significantly less involved, the standard set forth in § 3B1.2(b). We no longer seek the reduction contemplated by this section. Nonetheless, the depth of the informant's involvement in the events that led to this case is a fact the law and the Guidelines make relevant. It belongs in the balance. Because of that involvement, and more than that because of the disturbing specifics of that involvement, these facts weigh heavily on the mitigation side of the scale.

### B. Simple Possession

Mr. Crowder's shared decision against actually using the Molotov cocktails on September 1st was confirmed by the fact that the time at which he and David McKay discussed using them had come and gone by the time of his arrest later that day. This fact renders this case one of simple possession. This in turn reduces the significance of the suggested guideline range, because that range is based on cases that involve more serious conduct. Because the Guidelines, for the most part, get their values from an analysis of

sentences previously imposed,[25] they are only as relevant to a particular case as the underlying data allows them to be. Possession of unregistered firearms is a concern both because destructive devices such as these are inherently dangerous and because people who possess them are usually up to no good and intend to use them. Prosecutions of these cases often involve situations in which the possession happens in the course of other, more serious conduct, conduct sometimes charged, sometimes not. The Guidelines are therefore based on sentencing data that include these mores serious cases.[26]

As far as Mr. Crowder is concerned, this greater concern did not apply at the time of his arrest. While it is true that discussion and a plan of actually using the devices took place, that threat no longer existed by the time of his arrest. For his part, Mr. Crowder's offense conduct is limited to possession. Because the Guidelines process offenses involving more serious behavior, the sentence range they suggest is less relevant to this case.

**III. Sentence**

Sentencing mitigation receives further support in response to the factors recognized at 18 U.S.C. § 3553(a). The law governing federal sentencing, § 3553(a), et. seq., calls for the consideration of the sentencing guidelines themselves,[27] and a host of other factors including the nature and circumstances of the offense, the history and

---

[25] See, e.g., USSG Chapter 1, Part A (3).

[26] Id.

[27] 18 U.S.C. § 3553(a)(4)(A)(i).

characteristics of the offender,[28] and what will best advance his or her rehabilitation.[29]

The details of these considerations are guided by one overriding principle and one Congressional finding. Congress specified that the sentence should be the minimum necessary to accomplish the purposes of sentencing.[30] Further, Congress found that "imprisonment is not an appropriate means of promoting correction and rehabilitation," which are themselves goals of sentencing.[31] In this case, uncontested facts, these now unfettered sentencing factors, and the statutes' call for non-custodial rehabilitation and a sentence no longer than necessary to accomplish the statutory objectives for sentencing all support a sentence that is significantly lower than that which the guidelines recommend.

The answer to the central sentencing question, what sentence is no longer than necessary to accomplish the purposes of sentencing set forth in the sentencing statutes, receives an unusual amount of direction from the record in this case. The § 3553(a) factors, including Mr. Crowder's history and characteristics and their relation to his offense, are illuminated by uncontested facts in the PSI. Mr. Crowder's history and characteristics show him to be motivated by an overwhelmingly positive set of beliefs. Although they recoil from his offense conduct, the people who know him best are proud of his past and excited to witness his accomplishments in the future.

---

[28] 18 U.S.C. § 3553(a)(1).

[29] 18 U.S.C. § 3553(a)(2)(D).

[30] 18 U.S.C. § 3553(a).

[31] 18 U.S.C. § 3582(a).

Section 3553(a) also calls for consideration of the nature and circumstances of the offense. As discussed above, Mr. Crowder had abandoned any plan to use the devices before his arrest. The nature of Bradley Crowder's offense as one of simple possession adds additional weight to the mitigation side of the scale.

We ask that the Court also consider the punishment that has already been imposed. Mr. Crowder will have served eight months by the time of his sentencing. This is hard time for more reasons than just the oppressiveness of time in the county jail and the weight of the uncertainty of not knowing what will happen to him. News stories about the case discussed his identification of David McKay as the person with whom he participated in the offense at the time of his plea and the fact of his likely testimony in the retrial, albeit compelled. As a result, he has spent a meaningful portion of his time in custody labeled as a snitch.

Bradley Crowder has never served time before. Counsel can verify that he has experienced all of the added punishment that one would expect where a young man is serving time for the first time, far from his family and community. Mr. Crowder and his family and friends have been energetic in maintaining contact by telephone and in letters. This reflects well on all involved and is a sign of the depth of community support that will be available to him upon release. Nonetheless, he has experienced an extended period of detention separated from his main sources of support. This, too, is punishment already imposed.

Mr. Crowder recognizes and accepts that he is the author of these punishments, and blames no one other than himself. However, that his actions caused the punishment already imposed does not change the fact that it is punishment, and that it bears consideration. The central sentencing question is not what the punishment should be, but instead whether additional punishment is necessary to reach an amount that is sufficient but not greater than necessary. We submit that the punishment already imposed is significant, and that a sentence that requires him to serve a modest additional term adequately addresses the statute's objectives of deterrence and retribution. As Congress itself recognized, the statute's additional objective of facilitating rehabilitation is in this case better addressed by supervision and conditions that include community service and education. Opportunities for these activities abound in Austin.

## Conclusion

For the reasons set forth above, the record in this case supports a sentence below the range suggested by the Sentencing Guidelines. We ask the Court to give a sentence of one year and one day its most serious consideration.

Dated: April 24, 2009

Respectfully submitted,

*s/ Andrew H. Mohring*

_____
Andrew H. Mohring
Attorney No. 190731
Attorney for Defendant
Office of the Federal Defender
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415